**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Cheryl Dawn JAMES, Defendant-
Appellant.**

**No. 71-1919.**

United States Court of Appeals,
Ninth Circuit.

July 26, 1972.

Hufstedler, Circuit Judge, dissented and filed opinion.

Nick Chaivoe (argued), of Peterson, Chaivoe & Peterson, Portland, Or., for appellant.

Tommy Hawk, Asst. U. S. Atty. (argued), D. Richard Hammersley, Asst. U. S. Atty., Portland, Or. for appellee.

Before HUFSTEDLER and CHOY, Circuit Judges, and SCHNACKE, District Judge.*

SCHNACKE, District Judge:

Appellant, following proceedings conducted under the Federal Juvenile Delinquency Act (the FJDA), 18 U.S.C. § 5033, was adjudged to be a juvenile delinquent by virtue of two violations of 18 U.S.C. § 111, consisting of assaults upon agents of the Federal Bureau of Investigation. We affirm.

At the time of the offense, appellant was seventeen years of age and thus eligible for trial and sentence under the FJDA. It is undisputed that appellant was fully informed of her right to prosecution by indictment, to trial thereupon by jury, and of the consequences of her consent to proceedings under the FJDA. Thus informed, she expressly waived such rights and consented to the FJDA proceeding.

It is now contended that the waiver specified in the FJDA is ineffective and the FJDA unconstitutionally denies a juvenile the right to a jury trial guaranteed by the Sixth Amendment.

Appellant relies upon Nieves v. United States, 280 F.Supp. 994 (S.D.N.Y., 1968) which rested heavily upon the then recently decided In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and even charges trial counsel with incompetence for not advising appellant that, under *Nieves*, she could demand a jury trial despite her election to be proceeded against under the FJDA.

However, the law has developed, if not changed, since *Nieves* was decided. Most notably, the Supreme Court in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) held that, despite *Gault*, a jury is not required in state court juvenile proceedings, pointing out that,

"The Court, however, has not yet said that *all* rights constitutionally assured to an adult accused of crime also are to be enforced or made available to the juvenile in his delinquency proceedings." (Opinion of Mr. Justice Blackmun, 403 U.S. 528, at p. 533, 91 S.Ct. 1976, at p. 1980; emphasis the Court's.)

█ *McKeiver*, of course, did not deal expressly with the FJDA. However, its reasoning, particularly its concern that

". . . There is a possibility, at least, that the jury trial, if required as a matter of constitutional precept, will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate,

* Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation.

informal protective proceeding." (403 U.S. 528, 545, 91 S.Ct. 1976, 1986.) is fully as applicable to proceedings under the FJDA as to state court juvenile proceedings. The Court of Appeals for the Eighth Circuit has so held, Cotton v. United States, 446 F.2d 107 (1971), and we agree.

The balance of the appeal relates to the circumstances surrounding the offenses with which appellant was charged. In brief summary, these are: Having been instructed to seek appellant's brother, Charles James, a military deserter, four FBI agents went to a house in Portland occupied by appellant's family. Outside they observed a man answering the description of Charles James (and who later proved so to be) entering the house with others. The agents entered the house through the front door, left open by a young man who had preceded the agents into the house. The agents identified themselves, and arrested Charles James. At this point they were attacked by Charles James, other family members and by the family dog. One agent was floored by a rolling pin wielded by appellant, then kicked in the face by Charles James. Another agent then tried to control Charles James, and was kicked in the crotch by appellant.

■ Appellant urges that the agents unlawfully entered the house, that the arrest of Charles James was thus illegal, and, therefore, that defendant's assault on the agents was no offense. The contention is without merit.

■ Agents of the Federal Bureau of Investigation may make arrests, 18 U.S. C. § 3052, and any civil officer having authority to apprehend offenders under any federal or state law may summarily apprehend a deserter and deliver him into custody. 10 U.S.C. § 808. To accomplish the arrest they may enter premises where they have reasonable cause to believe the deserter may be found. Michael v. United States, 393 F.2d 22 (10th Cir., 1968). This is certainly so if there is no force used and the entry is through an open door. Dickey v. United States, 332 F.2d 773 (9th Cir., 1964).

■ The contention is also made that defendant was not aware of the official status of the victim. On sufficient evidence, including proof of a further assault at the time of her later arrest when she unquestionably knew the agents' status, the trial judge properly found to the contrary. In any event, knowledge of such status is not an element of the offense. McEwen v. United States, 390 F.2d 47 (9th Cir., 1968).

Other points raised by appellant are insubstantial and require no discussion.

The judgment is affirmed.

HUFSTEDLER, Circuit Judge (dissenting):

I dissent because I am convinced that the jury waiver provisions of the Federal Juvenile Delinquency Act are unconstitutional.

At the time of the offense Cheryl was 17 years old, and she was given the choice between trial as an adult or trial as a juvenile under the Federal Juvenile Delinquency Act ("FJDA", 18 U.S.C. §§ 5031–37). However, by the terms of FJDA (18 U.S.C. §§ 5032 [1] and 5033 [2])

---

1. 18 U.S.C. § 5032 provides:
   "A juvenile alleged to have committed one or more acts in violation of a law of the United States not punishable by death or life imprisonment, and not surrendered to the authorities of a state, shall be proceeded against as a juvenile delinquent if he consents to such procedure, unless the Attorney General, in his discretion, has expressly directed otherwise.

"In such event the juvenile shall be proceeded against by information and no criminal prosecution shall be instituted for the alleged violation."

2. 18 U.S.C. § 5033 provides:
   "District Courts of the United States shall have jurisdiction of proceedings against juvenile delinquents. For such purposes, the court may be convened at

she could not exercise her choice in favor of FJDA unless she consented to be tried as a juvenile under the Act and thus waived trial by jury. Cheryl, represented by counsel, signed the requisite consent and waiver. The district court found that she was a juvenile delinquent and ordered her committed to custody for 18 months.[3] This appeal followed.

The majority opinion's reliance upon McKeiver v. Pennsylvania (1971) 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 is misplaced for two reasons: (1) *McKeiver* did not purport to hold or even to hint that the Sixth Amendment does not guaranty a right to trial by jury to juveniles who are tried in federal courts for federal offenses, and (2) *McKeiver* does not touch the constitutionality of FJDA's statutory scheme to induce a waiver of trial by jury, the sole constitutional question that we need to decide here.

A plurality in *McKeiver* held that the due process clause of the Fourteenth Amendment did not compel the states to accord jury trials to juveniles in state juvenile delinquency proceedings. To the extent that the *McKeiver* opinions bear upon the right of juveniles to trial by jury in federal juvenile proceedings, the opinions imply a result contrary to the majority's conclusions.

Mr. Justice Douglas' dissenting opinion (Black, Marshall, JJ., concurring)

would have applied the Sixth Amendment guaranty to state delinquency proceedings; *a fortiori* those Justices would have applied the Sixth Amendment to federal delinquency proceedings. Mr. Justice Harlan concurred in the result reached by the plurality solely because he adhered to his view that "criminal jury trials are not constitutionally required of the States, either as a matter of Sixth Amendment law or due process." (403 U.S. at 557, 91 S.Ct. at 1992.) Mr. Justice Brennan agreed with the plurality that the particular state juvenile proceedings were outside the Sixth Amendment guaranty, but he observed that the "Sixth Amendment, where applicable, commands that these interests be protected by a particular procedure, that is, trial by jury." (403 U.S. at 554, 91 S.Ct. at 1990.)[4]

If we had to decide whether the Constitution compels the giving of the right of trial by jury to juveniles in federal delinquency proceedings, either by the command of the Sixth Amendment or by Article III, section 2, clause 3,[5] or both, I would more meticulously sift through the *McKeiver* dicta to extract all of the instruction on the issue that is there available. However, this case does not turn on the probable results of a Supreme Court decision on issues that have not yet been decided. I do not further analyze *McKeiver* because it offers no

---

any time and place within the district, in chambers or otherwise. The proceeding shall be without a jury. The consent required to be given by the juvenile shall be given by him in writing before a Judge of the District Court of the United States having cognizance of the alleged violation, who shall fully apprise the juvenile of his rights and of the consequences of such consent. Such consent shall be deemed a waiver of a trial by jury."

3. The district court stayed execution of the sentence to permit her to complete her term at high school.

4. Neither the opinion of Mr. Justice Blackmun (the Chief Justice, Stewart and White, JJ., concurring) nor the specially concurring opinion of Mr. Justice White support a conclusion that those Justices

would uphold a federal delinquency proceeding against constitutional attack on Sixth Amendment or due process grounds if the proceeding were, in practice, not significantly different from an adult prosecution.

Both opinions recognize that juvenile proceedings have often fallen woefully short of the benevolent aims of those who initiated the juvenile court movements. Both opinions discuss the problems inherent in trying to protect flexibility in state juvenile proceedings, for the purpose of bringing those proceedings closer to their intended aims, and trying simultaneously to protect juveniles from the worst of the systems' failures.

5. In pertinent part, clause 3 provides: "The Trial of all Crimes . . . shall be by Jury."

help on the waiver issue that should be dispositive of this case.

The provisions of FJDA that together coerce a waiver of trial by jury are these: (1) A juvenile who is a member of the class potentially qualified for proceedings under the Act[6] "shall be proceeded against as a juvenile delinquent if he consents to such procedure" (§ 5032); (2) the juvenile delinquency proceeding "shall be without a jury" (§ 5033); and (3) "[t]he consent required to be given by the juvenile . . . shall be deemed a waiver of trial by jury." (§ 5033).[7]

Under the federal statutory scheme all juveniles who are charged with federal crimes are initially subjected to the same pretrial and adjudicatory procedures as adults. All juveniles who are outside the class of juveniles who qualify for proceedings under FJDA and all juveniles who are members of that class but who fail to sign the consent and waiver are prosecuted as adults. Juveniles prosecuted as adults undoubtedly have a constitutionally guaranteed right to trial by jury. The statute requires that the juvenile waive that constitutional right to enable him to invoke the benefits of FJDA.

The fact that a defendant in the criminal process may have to forego one or more constitutional rights in order to obtain benefits in the form of lesser potential punishment does not inevitably mean that his relinquishment of those rights is constitutionally invalid. However, the components of his "bargain" are subject to close judicial scrutiny. The bargain will fail unless the governmental interest in securing the waiver is legitimate and compelling, the means

employed are no more drastic than are necessary to achieve the governmental ends, and the bargain is fair to the defendant.

In United States v. Jackson (1968) 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, the Supreme Court struck down the death penalty provision of the Federal Kidnaping Act. The death penalty was authorized only upon recommendation of a jury. The statute did not authorize the death penalty for a defendant who waived a jury trial or who pleaded guilty. The Court held that this statutory scheme impermissibly burdened a defendant's right to a jury trial. Although the Government had a legitimate interest in mitigating punishment, the means used were unnecessary to achieve the Government's ends:

"If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional. But, as the Government notes, limiting the death penalty to cases where the jury recommends its imposition does have another objective: It avoids the more drastic alternative of mandatory capital punishment in every case. . . .

". . . Whatever might be said of· Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. Cf. United States v. Robel, 389 U.S. 258, [88 S.Ct. 419, 19 L.Ed.2d 508]; Shelton v. Tucker, 364 U.S. 479, 488–489, [81 S.Ct. 247, 5 L.Ed.2d 231]. The question is not whether the chilling effect is 'incidental' rather than intentional; the ques-

---

6. The statutory class consists of juveniles who have not attained their 18th birthdays, whose acts in violation of a federal law are not punishable by death or life imprisonment, who have not surrendered to authorities of a state, and with respect to whom the Attorney General has not directed proceedings other than juvenile. (18 U.S.C. §§ 5031, 5032.)

7. The statutory scheme also involves a waiver of indictment by a grand jury (§ 5032) and a waiver of public trial (§§ 5032, 5033). I do not reach the constitutional issues posed by these aspects of FJDA, although much of what I say concerning the coercive effect of the statutory scheme on the right to trial by jury seems to be equally applicable to a coerced waiver of these two important constitutional rights.

tion is whether that effect is unnecessary and therefore excessive. In this case the answer to that question is clear. The Congress can of course mitigate the severity of capital punishment. The goal of limiting the death penalty to cases in which a jury recommends it is an entirely legitimate one. But that goal can be achieved without penalizing those defendants who plead not guilty and demand jury trial. . . . Whatever the power of Congress to impose a death penalty for violation of the Federal Kidnaping Act, Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right. See Griffin v. California, 380 U.S. 609, [85 S.Ct. 1229, 14 L.Ed.2d 106]." (390 U.S. at 581–583, 88 S.Ct. at 1216. Footnote omitted.)

The 1970 plea bargaining trilogy (North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162; Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785; Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747) involved waivers of constitutional rights induced by the expectation of lesser penalties than those to which the defendants knew that they would be, or thought they would be, exposed had they not yielded those rights. In each instance the Court discussed the legitimate public interests in encouraging plea bargains, the need for these inducements to achieve the governmental aims, and the advantages of the bargain to both the public and the defendant. In the context of each case, the majority of the Court concluded that the waivers were knowing, intelligent, and voluntary, and, under the facts of each case, the bargain was fair to the defendant at the time it was made.

In *Jackson*, the Court could discern slight public interest in reaching a legitimate goal by means which infringed individual constitutional rights when alternative means for achieving the same goal were readily available. In *Brady*, on the other hand, the Court perceived a compelling public interest in effectively inducing negotiated pleas, which interest could not be otherwise served. Implicit in all of these cases is the concept of balancing which has permeated the cases adjudicating collisions between personal rights secured by the Constitution and competing governmental interests.

The potential benefits to a juvenile from FJDA proceedings are by no means insubstantial and the statutory scheme exerts strong pressure on a juvenile to waive his right to trial by jury. Cheryl, for example, if successfully prosecuted as an adult, faced possible imprisonment for a maximum of 13 years and a maximum fine of $15,000. She would also have had a felony conviction upon her record. A finding of delinquency under FJDA, however, would subject her to potential confinement until she was 21 years old (about three years from the date of sentencing), and the finding of delinquency would not be deemed a criminal conviction. Cheryl had to choose between prosecution as an adult with the right to trial by jury and proceedings as a juvenile without the right to trial by jury but with the statutory promise that the juvenile course was potentially much less punitive.

The governmental interests in requiring a juvenile to waive his constitutional right to trial by jury in order to receive the benefits of special treatment under FJDA are difficult to define. The only reference to the jury waiver provisions in the meager legislative history of the Act is found in a letter from Attorney General Cummings, sponsor of the Act, which is incorporated in both the House and the Senate Reports:

"Juvenile delinquents are to be prosecuted by information and tried before a district judge, without a jury, who may hold court for that purpose at any time and place within the district, in chambers or otherwise. Informal proceeding of this kind has been found in many of the States conducive to attaining the humane and beneficent objects of such legislation. The consent of the juvenile is, how-

ever, to be required to a prosecution for juvenile delinquency under the act instead of for the substantive offense. It has been held that minors may waive the constitutional right to a trial by jury, in the same manner as adults."

(H.R.Rep. No. 2617, 75th Cong., 3d Sess., June 7, 1938, and S.Rep. No. 1989, 75 Cong., 3d Sess., June 6, 1938.)

There can be no doubt that the Government has a legitimate, compelling, and even vital interest in fostering a system of juvenile justice in which young offenders, who may profit from less punitive correctional methods, will receive penalties that are not as severe as those imposed upon adults who were guilty of similar offenses. However, such laudable aims can be achieved without the necessity of compelling the juvenile to waive his right to trial by jury to which he would be otherwise entitled in his criminal prosecution as an adult simply by giving him the option to proceed with the criminal prosecution or to subject himself to juvenile proceedings unfettered by a command that he waive a jury trial.

From the legislative history, it appears that Congress' intent in inserting the waiver provisions in FJDA was solely to discourage juveniles from exercising their right to trial by jury. When the only governmental aim of a statutory provision is the defeat or the discouragement of the exercise of a constitutionally guaranteed right, the provision is "patently unconstitutional." (United States v. Jackson, supra, 390 U.S. at 581, 88 S.Ct. 1209.) There is no such

thing as a legitimate governmental interest in destroying or impairing the exercise of a constitutional right even if Congress sincerely believed that deprivation of that right was for a defendant's own good.

Even if I assumed, arguendo, that Congress could constitutionally withdraw the right of trial by jury from all juveniles charged with federal offenses, the waiver device used in FJDA will not survive constitutional challenge. In enacting FJDA, Congress did not attempt to withdraw juveniles from the adult pretrial and adjudicatory procedures to which they are now subject.[8] Juveniles as well as adults are a part of a single class of persons charged with federal crimes, and juveniles and adults alike are guaranteed the right to trial by jury. Under FJDA, the only members of the class who lose the right to trial by jury are those juveniles who qualify for FJDA and who execute consents and waivers of jury trials. The burden on the exercise of the right to trial by jury is not incidental; it is as direct as it was in Jackson.

There is not here, as there was in the guilty plea cases, any countervailing legitimate interests of the state which justify chilling the juvenile's right to a jury trial. The jury waiver provisions of FJDA are unconstitutional.[9] (Nieves v. United States (S.D.N.Y.1969, 3-judge court) 280 F.Supp. 994; People v. C. (1970) 27 N.Y.2d 79, 313 N.Y.S.2d 695, 261 N.E.2d 620; cf. United States v. Jackson, supra, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138.)

I am aware that the Eighth Circuit in Cotton v. United States (1971) 446 F.2d

8. If Congress enacted statutes creating a separate system of juvenile justice that was neither in text nor in practice substantially similar to the adult criminal system and if, as a part of that juvenile system, it provided that there shall not be a right to trial by jury, the draftsmen could find a good deal of reassurance from the McKeiver opinions that their legislative plan would survive constitutional attack. However, Congress did not come close to that scheme in drafting FJDA.

9. I do not thereby imply that all federal juvenile proceedings must be tried by jury or that no nonjury system free from the taint of compelled waiver would withstand constitutional attack.

Where jury trials have been afforded juveniles, the limited empirical evidence available shows that the overwhelming percentage of juveniles waive jury trial. (See McKeiver v. Pennsylvania, supra, 403 U.S. at 561–562, n. 91 S.Ct. 1976 (opinion of Mr. Justice Douglas).)

107 is to the contrary. *Cotton* rests on two grounds, both stated in conclusory terms:

(1) *McKeiver* controls the constitutional issue, and (2) section 5033 gives a juvenile a choice which *Cotton* intelligently exercised. My analysis of *McKeiver* reveals that the first ground is erroneous. The second ground does not meet the essential constitutional issue, which is controlled by *Jackson.*[10]

I would reverse the order adjudicating Cheryl a delinquent and remand the case for further proceedings consistent with the views I have herein expressed.

10. I point out one possible ambiguity in the majority opinion. It is true that under McEwen v. United States (9th Cir. 1968) 390 F.2d 47, cert. denied 392 U.S. 940, 88 S.Ct 2319, 20 L.Ed.2d 1400 knowledge of the official identity of the victim is not an essential element of an offense under 18 U.S.C. § 111. However, the statute does not eliminate mens rea and such knowledge may be material. (United States v. Kartman (9th Cir. 1969) 417 F.2d 893, 894–895.) The use of reasonable force to prevent injury to another from what reasonably appears an unprovoked attack is not a violation of Section 111, and, had Cheryl been able to establish that she was unaware of the agents' official status, it would have furthered her theory that she was merely coming to the aid of her younger brother who had a heart murmur and whom she thought an agent was choking. (United States v. Goodwin (3d Cir. 1971) 440 F.2d 1152, 1156; United States v. Grimes (7th Cir. 1969) 413 F.2d 1376, 1379; United States v. Heliczer (2d Cir. 1967) 373 F.2d 241, 249, cert. denied, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359; United States v. Forrest (E.D.Wis.1969) 300 F.Supp. 1011, 1013; cf. Morissette v. United States (1952) 342 U.S. 246, 263, 273, 276, 72 S.Ct. 240, 96 L.Ed. 288; Pettibone v. United States (1893) 148 U.S. 197, 204–210, 13 S.Ct. 542, 37 L.Ed. 419; United States v. Rybicki (6th Cir. 1968) 403 F.2d 599, 601–602.)